**NOT FOR PUBLICATION**                                        **CLOSED**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| DANIEL JAVIER DELGADO, | : | |
| | : | |
| Petitioner, | : | Civil Action No. 09-3728 (JLL) |
| | : | |
| v. | : | **O P I N I O N** |
| | : | |
| ANNE MILGRAM, | : | |
| | : | |
| Respondent. | : | |

**LINARES**, District Judge:

Petitioner Daniel Javier Delgado ("Petitioner") filed the instant Petition ("Petition"),

seeking a writ of habeas corpus, pursuant to 28 U.S.C. § 2254(a), and challenging a judgment of

conviction in the Superior Court of New Jersey.  Respondent filed an answer to the Petition, and

Petitioner traversed.  For the reasons expressed below, the Court will dismiss the Petition and

will decline to issue a certificate of appealability.  See 28 U.S.C. §§ 2253(c), 2254(a), (b), (c).

## I.    STANDARD OF REVIEW

Section 2254(a) of Title 28 of the United States Code gives the court jurisdiction to

entertain a habeas petition challenging a state conviction or sentence only where the inmate's

custody violates federal law:

> [A] district court shall entertain an application for a writ of habeas corpus in
> behalf of a person in custody pursuant to the judgment of a State court only on the
> ground that he is in custody in violation of the Constitution or laws or treaties of
> the United States.

28 U.S.C. § 2254(a).

"In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." Estelle v. McGuire, 502 U.S. 62, 67-68 (1991); 28 U.S.C. § 2254(a); accord Barry v. Bergen County Probation Dept., 128 F.3d 152, 159 (3d Cir. 1997). "Federal courts hold no supervisory authority over state judicial proceedings and may intervene only to correct wrongs of constitutional dimension." Smith v. Phillips, 455 U.S. 209, 221 (1982). "If a state prisoner alleges no deprivation of a federal right, § 2254 is simply inapplicable. It is unnecessary in such a situation to inquire whether the prisoner preserved his claim before the state courts." Engle v. Isaac, 456 U.S. 107, 120 n.19 (1982). "[E]rrors of state law cannot be repackaged as federal errors simply by citing the Due Process Clause." Johnson v. Rosemeyer, 117 F.3d 104, 110 (3d Cir. 1997). Moreover, "it is well established that a state court's misapplication of its own law does not generally raise a constitutional claim." Smith v. Horn, 120 F.3d 400, 414 (3d Cir. 1997) (citation omitted); see also Smith v. Zimmerman, 768 F.2d 69, 71, 73 (3d Cir. 1985).

A district court must give deference to determinations of state courts. See Duncan v. Morton, 256 F.3d 189, 196 (3d Cir.), cert. denied, 534 U.S. 919 (2001); Dickerson v. Vaughn, 90 F.3d 87, 90 (3d Cir. 1996). Federal courts "must presume that the factual findings of both state trial and appellate courts are correct, a presumption that can only be overcome on the basis of clear and convincing evidence to the contrary." Stevens v. Delaware Correctional Center, 295

2

F.3d 361, 368 (3d Cir. 2002).  Where a federal claim was "adjudicated on the merits" [1] in state

court proceedings, § 2254 does not permit habeas relief unless adjudication of the claim

>    (1)    resulted in a decision that was contrary to, or involved an unreasonable
>           application of, clearly established Federal Law, as determined by the
>           Supreme Court of the United States; or
>
>    (2)    resulted in a decision that was based on an unreasonable determination of
>           the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

A decision is "'contrary to' a Supreme Court holding if the state court 'contradicts the

governing law [as it is interpreted or] set forth in [the Supreme Court's, rather than in any state

court's or any circuit court's] cases' or if it 'confronts a set of facts that are materially

indistinguishable from a decision of th[e Supreme] Court and nevertheless arrives at a [different]

result."  Williams v. Taylor, 529 U.S. 362, 405-06 (2000).

In other words, under the "'unreasonable application' clause, a federal habeas court may

grant the writ if the state court identifies the correct governing legal principle from th[e Supreme]

Court's decisions but unreasonably applies that principle to the facts of the prisoner's case."  Id.

at 413.  Whether a state court's application of federal law is "unreasonable" must be judged

objectively, which means that an application may be incorrect, but still not unreasonable.  Id. at

409-10.

---

[1] "An 'adjudication on the merits' has a well settled meaning: a decision finally resolving the parties' claims, with res judicata effect, that is based on the substance of the claim advanced, rather than on a procedural, or other, ground."  Sellan v. Kuhlman, 261 F.3d 303, 311 (2d Cir. 2001).  A state court may render an adjudication or decision on the merits of a federal claim by rejecting the claim without any discussion whatsoever; such determination is nonetheless subject to same degree of deference for the purposes of the court sitting in habeas review.  See Harrington v. Richter, 2011 U.S. LEXIS 912 (U.S. Jan. 19, 2011).

A court begins the analysis by determining the relevant clearly established law.  See Yarborough v. Alvarado, 541 U.S. 652, 660 (2004).  Clearly established law "refers to the holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time of the relevant state-court decision."  Williams, 529 U.S. at 412.   A court must look for "the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision."  Lockyer v. Andrade, 538 U.S. 63, 71, 72 (2003).

## II.   FACTUAL AND PROCEDURAL BACKGROUND

### A.   Evidence as to the Victim's Death and Petitioner's Motive for Murder

Petitioner was convicted of shooting to death a certain Daniel Cortez ("Cortez").  It is undisputed that Cortez was shot right outside his house in Newark, and that shooting occurred  at the early morning hours of November 25, 1998.[2]

One week prior to the date of shooting, Petitioner's girlfriend, Sandra Jorge ("Jorge"), broke off her relationship with Petitioner.  See Docket Entry No. 10-15.  Apparently, half a year prior to the shooting (May 1998),  Jorge met Cortez and became intimate with him while being still in relationship with Petitioner.  See id.  As a result of the foregoing, Cortez, seemingly, developed an impression that he and Jorge were starting a relationship and, on May 30, 1998, when Jorge and her female friend were walking through the streets of Newark, Cortez and his friend, Antonio Aponte ("Aponte"), pulled over Cortez's car so Cortez could chat with Jorge.  See id.; see also Docket Entry No. 10-17.  During that Cortez's chat with Jorge, Petitioner appeared and approached Jorge questioning her why she was talking to Cortez.  See Docket

---

[2]  On November 25, 1998, sunrise took place in Newark, New Jersey, at 6:55 a.m.  See <<http://www.timeanddate.com/worldclock/astronomy.html?n=861&month=11&year=1998&obj=sun&afl=-11&day=1>>.

Entry No. 10-15.  That prompted an angry exchange between Cortez and Petitioner.  However, no physical altercation took place because the police arrived in these very minutes, before any blows were actually struck, and took all the persons present at the event to the police station.  See Docket Entry No. 10-17.  When everyone was released and leaving the police station, Petitioner shook his fist at Cortez, exclaiming, "I'm going to get you!"  See id.

The next week, that is, the first week of June 1998, Jorge confessed to Petitioner that she and Cortez had been intimate.  See Docket Entry No. 10-15.  Petitioner grew visibly upset upon learning this information and stated to Jorge that he would "get" Cortez.  See id.  As noted supra, six months later, Jorge broke off her relationship with Petitioner and, one week after this break-off, Cortez was shot from a small caliber revolver and died, right after the shooting, as a result of blood loss from bullet wounds in his face, chest and shoulders.  See Docket Entries Nos. 10-15 and 10-18.

**B.    Evidence as to the Identity of the Shooter and Shooter's Vehicle**

Four persons witnessed the shooting: Al Bucci ("Bucci"), Edmund DiEduardo ("DiEduardo"), Richie Munoz ("Minoz"), and Anthony Melillo ("Meillo").

**1.    Evidence Obtained from Bucci**

Bucci, who, at the time, was thirty-one years old and lived on the same street as Cortez, holding a second-floor apartment with his wife and son, was the person who called the police after the shooting took place.  See Docket Entry No. 10-12.  At about 7:00 a.m. on the day of shooting, Bucci went outside to start his van (in order to warm it up) and, as he was returning back to his apartment, he heard gunshots.  See id.  Bucci then ran upstairs and looked outside, through his window, being about 10 to 15 yards away from the scene.  See id.  Although Bucci

5

did not see the face of the shooter, he clearly saw one person shooting another.  See id.  He also noticed a maroon van and a black Honda that were parked in the street, and he observed that the victim was trying to hide behind the Honda while the shooter was standing next to the van.  See id.  Bucci saw that the victim had his hands up and, when the victim fell to the ground, the shooter leaned over the victim, shot him one more time and then jumped into the van and sped away.  See id.

Bucci described the shooter's vehicle as the one resembling a "Caravan" minivan and noted that it had a missing hubcap and an "old style" New Jersey license plate, in the sense that the license plate was blue with white letters.  See id.  Bucci was able to make out only the first three letters of the license plate; according to him, these letters were "HAI."  See id.

As noted supra, Bucci was the one who called the police; he also went to the police station to give his statement as to all the information detailed above.  See id.  A few days later, the police visited Bucci at his house and showed him pictures of a certain van (or, perhaps, pictures of various vans), but Bicci was unable to identify the van used by the shooter from these photos.  See id.  In light of this fact, police detectives drove Bucci to look at a certain van in physical reality.  See id.  Upon observing that van, Bucci stated that he was 75% sure it was the van used by the shooter.  See id.

About half a year later, Bucci was asked, once again, to examine various photographs of vans and – upon such examination – he selected one photograph as the vehicle he saw during the shooting.[3]  See id.

---

[3]  Police investigation of Cortez's murder was in two parts, with the first part yielding certain leads but not producing sufficient information to prosecute.  The second part was

(continued...)

### 2.      Evidence Obtained from DiEduardo

DiEduardo, a then-71-year-old individual, was Bucci's ground-floor neighbor.  See Docket Entry No. 10-15.  On the day of the shooting, at about  7:10 a.m., he was returning home from a delicatessen where he had his coffee.  See id.  As he was approaching the scene of the crime, he heard gunshots and hid behind a parked car.  See id.  Being about 32 feet away from the scene, DiEduardo saw a person who shot another person in the head, with a small revolver, and then ran to his parked vehicle and sped off.  See id.

DiEduardo was visited by the police at his place of employ.  See id.  The policemen showed DiEduardo some photographs, but DiEduardo declined to make any identification, initially claiming that it was too early in the morning and, hence, too dark to see clearly at the time of the shooting and, later on, noting his concern that his life might be in danger if he were to identify the shooter in front of other employees.  See id.; see also Docket Entry No. 10-13.

When, later on, DiEduardo met in private with two police detectives and was presented with an array of photographs, he picked out Petitioner's photo as the one depicting the shooter.  See Docket Entry No. 1-15.  DiEduardo also identified Petitioner as the shooter during Petitioner's trial.  See id.

### 3.      Evidence Obtained from Munoz

At the time of the shooting, Munoz, Cortez' cousin, was only 11 years old.  See Docket Entry No. 10-16.  He was living in a second floor apartment at the house not far from that

---

[3](...continued)
conducted by detectives from the "Cold Case" group who cured certain shortcomings that poisoned the first part of the investigation.  The peculiarity of this two-part investigation caused, in turn, three-month-to-half-a-year gaps between the first round of witnesses' interviews and presentment of arrays of photographs and the second round of the same.

occupied by the Buccies and DiEduardo; the first floor apartment of Minoz's house was occupied by Cortez.  See id.

On the day of the shooting, Munoz was awakened at about 7:00 a.m. by a certain noise. He then heard a car alarm and recognized it to be the alarm from Cortez' Honda.  See id.  With that, Munoz fully woke up and went to brush his teeth, and then began getting dressed for school. See id.  At that time, he heard gunshots from outside and ran to his living room window to look. See id.  He saw a vehicle, which he made out as a blue Plymouth van, situated near Cortez's Honda, and he also saw a light-skinned male with short dark hair[4] who seemed shooting at what Munoz thought were his cousin's car's tires.  See id.  (Munoz never actually saw the particular gun used in the shooting.)  Upon hearing four to six gunshots, Munoz saw the shooter getting into the van and speeding off.  See id.  Once the van left, Munoz saw that Cortez was lying on the ground, next to Cortez's car, and so Munoz ran outside just to see his cousin die.  See id.

Later on the day of the shooting, the police came to Munoz's house and showed him an array of photos.  Munoz picked out two pictures stating that, in his opinion, the depicted men both looked similar to the shooter.  See id.  Apparently, Munoz was positive that the shooter was depicted in one of this photos, but he was too nervous to tell the fact of his positive identification to the police, being seemingly just an 11-year-old shaken by the death he witnesses first time in his life and, in addition, by the fact that, after the shooting, his brother began acting "crazy."  See id.; see also Docket Entry No. 10-13.  Munoz was also shown a van on the day of the shooting,

---

[4]  There is no dispute that Petitioner is a light-skinned Hispanic male.  See <<https:// www6.state.nj.us/DOC_Inmate/details?x=1210545&n=3>>. There also appears to be no dispute that, at the time of shooting, Petitioner had a short haircut and small amount of facial hair.

but he was unable to identify that van as the vehicle used by the shooter.  See Docket Entry No. 10-16.

However, a short time later, Munoz actually saw what he believed to be the shooter's van, located right in front of Munoz's school, and that encounter seemingly assisted Munoz in putting the picture of the van together in his mind.  See id.  Morever, on another occasion, Munoz managed to see the shooter himself, as the shooter was making a round in Munoz's neighborhood.  See id.

More than half a year after the shooting, Munoz again met with the police; at this meeting he was again shown an array of photographs.  See id.  This time around, Munoz unequivocally selected  Petitioner's photo as the one depicting the shooter.  See id.  He also easily picked out a photograph of the van that was used by the shooter on the day of the crime.  See id.  When asked to explain why he was so certain about his identifications of the shooter and the van this time around, Munoz clarified that, over the time after the shooting, he managed to calm down, had become less shaken by what he saw and could better reflect on his impressions.  See id.

During Petitioner's trial, Munoz unequivocally identified Petitioner as Cortez's shooter. See id.

### 4.        Evidence Obtained from Melillo

The last witness to the shooting was Melillo who, at that time, was 38.  Melillo, a person suffering from an on-and-off drug problem and having several convictions, was not under influence of drug or alcohol on the day of the shooting.  See Docket Entry No. 10-16.  Early in the morning of that day, Melillo was having coffee, when he observed a burgundy van, holding seemingly two men, slowly driving around the neighborhood and turning the corner.  See id.

Soon thereafter, the van reappeared; it was right at moment when Cortez came out of his apartment and was crossing the street toward his Honda.  See id.  At that time, Melillo observed that the van had become populated only by its driver, whom Melillo defined as a Hispanic male with a short haircut and a little facial hair.  See id.

Being located about 45 feet away from the scene, Melillo observed the van to pull up to Cortez, causing Cortez to turn around to look at the driver and be shot, four times, during the period of about 30 seconds.  See id.  Melillo believed that the driver shot Cortez out of the van's window, without even getting out, and then sped away.  See id.  Melillo testified that, as the van was leaving, the driver looking at Melillo for the period of at least ten seconds, allowing Melillo a good study of the shooter's facial features.  See id.

Melillo remained at the crime scene until the police arrived, but he did not volunteer to talk to the police, being not interested in getting involved.  See id.  When he was contacted by the police three weeks later and arrived to the police station, the detective who interviewing him treated Melillo as a criminal and drug addict, prompting Melillo to intentionally provide false information in order to get out of the investigative efforts and, also, as a revenge for being treated in such a disrespectful manner.  See id.

However when Melillo was contacted by two different detectives about half a year later, he decided to cooperate.  See id.  Being offered a photo array of suspects, Melillo unequivocally picked Petitioner as the shooter, and he also identified the photograph of the van used in the shooting.  See id.  During Petitioner's trial, Melillo again  identified Petitioner as the person who shot Cortez.  See id.

C.      **Investigation of Petitioner and the Van**

After the initial information was collected from the witnesses, the first stages of

investigation were handled by Officer Garcia.  See Docket Entry No. 10-13.  Thirty-six minivans

having licence plates beginning with "HAI" or "HA1" were identified in New Jersey.  See id.

One of these vehicles was selected as the one likely matching the description of the shooter's

van.  That particular van turned out being registered to Petitioner's mother, Grisell Alvarez.  See

id.; see also Docket Entry No. 10-14.  Upon its physical examination, Petitioner's mother's van

turned out to be a burgundy-color Plymouth Voyager[5] vehicle with a missing hubcap and an

old-style New Jersey license plate.  See Docket Entry No. 10-13. Upon this discovery, Petitioner

was photographed, with his consent.   (This photograph was later on used by the police as part of

photo arrays shown to the witnesses.  See id.)  One month later, that is, in December 1998,

Officer Garcia asked Petitioner to give a formal statement as to Petitioner's whereabouts and

activities on the day of the shooting.[6]  See Docket Entry No. 10-14.  Petitioner's demeanor

during this session of questioning struck Garcia as extraordinary, since Petitioner – while not

appearing to be under the influence of drugs and alcohol – was so nervous that he kept shaking

uncontrollably, almost sliding off his chair.  See id.

In his statement to Garcia, Petitioner claimed that – on the night preceding the day of the

shooting – he had slept at his mother's house, waking up at about 6:00 a.m. and leaving the

house about half an hour later.  See id.  He maintained that he just stopped by for breakfast and

_____

[5]  The parties appear in agreement that a Plymouth Voyager and a Dodge Caravan are
vehicles sufficiently similar in their overall shapes.

[6]  Although Petitioner was not arrested, Garcia – out of abundance of caution – read
Petitioner his Miranda rights prior to questioning.

11

then proceeded to his workplace in Union, New Jersey, where he arrived one hour later, that is, at about 7:30 a.m.  See id.  He admitted that, on that morning, he was driving his mother's burgundy van, the very one with one missing hubcap and old New Jersey licence place having the letters fitting the description provided by Bucci.  See id.

Petitioner also admitted seeing Cortez during Cortez's conversation with Jorge in May 1998.  However, Petitioner denied ever threatening Cortez or even having any friction with Cortez during that occurrence, even though it appears undisputed that the interaction between the parties present at the occurrence resulted in police taking of Petitioner, Cortez, Aponte, Jorge and Jogre's friend to the police station.  See id.

### D.   Petitioner's Trial and Following Proceedings

Petitioner's trial judge conducted a pretrial Wade hearing and determined that the out-of-court photo identifications procedures used by the police were not improper.  See Docket Entries Nos. 10-2 and 10-3.  Upon so determining, the trial judge allowed the State to use this evidence at trial.  However, that first trial ended in a mistrial when it became known that the prosecutor had failed to provide Petitioner's counsel with information about some of those incidents when the State's witnesses either failed or refused to identify Petitioner and his mother's van, or when they expressed uncertainties as to their identification, or made dual/alternative identifications.  See Docket Entry No. 10-26.

Following this mistrial, the second trial was conducted, prior to which Petitioner's counsel was informed about every positive, equivocal, and missed witness' identification that took place before the trial.  In response, Petitioner's counsel crafted a defense theory which was effectively based on Petitioner's claims that the witnesses misidentified Petitioner as the shooter

(and misidentified his mother's van as the shooter's vehicle); in connection with that theory, Petitioner's counsel took every opportunity to: (a) explore the State's witnesses' uncertainties, dual/alternative identifications and misidentifications by means of extensive cross-examination; and (b) highlight to the jurors these witnesses' uncertainties and misidentifications, in order to stress Petitioner's position as to the reasonableness of doubt.

Petitioner did not testify.  The jurors, weighing on credibility/reliability of the State's witnesses and their identifications, found that Petitioner murdered Cortez.  Therefore, the jury returned the verdict of guilty.

Petitioner appealed, essentially arguing that admission into evidence of witnesses' out-of-court and in-court positive identifications of Petitioner violated Petitioner's due process rights because these identifications took place after witnesses' initial out-of-court failures or uncertainties, or refusals to identify Petitioner or his mother's van, and hence all such positive identifications should have been not only challenged before jurors but altogether excluded from evidence.  See Docket Entries Nos. 11-1, 11-4 and 11-5.  In addition, Petitioner argued that his right to a public trial was violated during a brief period of voir dire.  See Docket Entry No. 11-1. After a temporary remand (for the narrow purposes of record settlement as to the public trial aspect),[7] see Docket Entry No. 11-2, the Appellate Division affirmed Petitioner's conviction and sentence.  See Docket Entry No. 11-8.  The Supreme Court of New Jersey granted Petitioner certification as to his first claim, that is, the due process rights-based aspect, see Docket Entry No. 11-11, and, too, affirmed his conviction stressing that, during Petitioner's second trial, Petitioner's counsel's knowledge of all out-of-court misidentifications and uncertainties of the

---

[7]  See infra, Section IV(B)(1) of this Opinion, detailing relevant events.

13

State's witnesses and the counsel's resulting thorough attacks on credibility/ reliability of the State's witnesses' identifications of Petitioner and his mother's van sufficiently safeguarded Petitioner's due process rights.  See Docket Entry No. 11-16.

Petitioner then filed his PCR application, effectively rehashing his original due process arguments into a claim that the prosecutor must have presented "false" testimony of State's witnesses, and added a handful of other claims.  See Docket Entries Nos. 11-17 and 11-18.

After this PCR application was dismissed by the Law Division, see Docket Entry No. 11-21, Petitioner appealed, see Docket Entries Nos. 11-22 and 11-23.  This appeal resulted in the Appellate Division's affirmance of the Law Division's determination.  See Docket Entry No. 11-25.  See Docket Entry No. 11-27.  When the Supreme Court of New Jersey denied Petitioner certification as to his PCR challenges, the instant Petition followed.  See Docket Entry No. 1.

## III.   PETITIONER'S INSTANT CHALLENGES

Petitioner raised five Grounds in this action.  Specifically, he asserted:

Ground One:   The state court's ruling that the petitioner was not deprived of his Fourteenth Amendment constitutional right to a fair trial by the failure of the trial court to suppress an impermissibly suggestive photo identification of [the] petitioner and a separate identification of his van from a photo array[,] by the failure of the police to make a record of an exculpatory non-identification[,] was contrary to clearly established federal law . . . .

Ground Two:   The state court's ruling that [the] petitioner was not deprived of his Sixth Amendment right to a public trial was violated when the trial court removed the spectators from the courtroom during jury selection was contrary to clearly established federal law . . . .

Ground Three:   The state court's ruling that [the] petitioner was not deprived of due process right to a fair trial by the prosecutor's knowing presentation of false testimony from two eyewitnesses, . . . Munoz

14

and . . . Bucci, and by her failure to correct that testimony after it was presented to the jury was contrary to clearly established federal law . . . .

Ground Four:    The state court's ruling that [the] petitioner was not deprived of his Sixth Amendment constitutional rights to the effective assistance of counsel when his attorney failed to present testimony from De[tective] De Maio, who would have directly contradicted the testimony of . . . Bucci when shown the [Petitioner's] van parked on the street he told the police that he was 75 percent sure that it was the van used in the crime was contrary to clearly established federal law . . . .

Ground Five:    The state court's ruling that the jury charge on identification, which made no mention of the witnesses' failed identification attempts, was not so incomplete as to deprive [the] petitioner of his due process right to a fair trial was contrary to clearly established federal law . . . .

Docket Entry No. 1-2.

## IV.  DISCUSSION

### A.    <u>Challenges Based on Introduction of Evidence</u>

The bulk of Petitioner's discussion with regard to his Ground One mounts challenges to presentation of evidence during his first trial, the one which resulted in a declaration of mistrial. These challenges are simply irrelevant to the Court's analysis, since Petitioner is not in confinement pursuant to any judgement of conviction resulting from that trial.

With regard to his second trial, the one which resulted in his conviction, Petitioner maintains that – even though his counsel was made aware of every uncertainty/misidentification of the State's witnesses' identifications and presented these uncertainties/misidentifications to the jury through many rounds of vigorous and lengthy cross-examination (plus highlighted the same in the counsel's opening and closing statements), these measures were still insufficient to

protect Petitioner's due process rights.  Essentially, Petitioner maintains that the only sufficient due process measure would be suppression of all positive identifications that were obtained after the State's witnesses expressed uncertainties or failed to make identifications.  Since Petitioner concedes that the State's case against him was based on witnesses' statements and connections of these statements to physical evidence, such as the car being a burgundy minivan, a missing hubcap, an old New Jersey licence plate, etc., Petitioner's position – if taken to its logical conclusion – suggests that his due process rights would be duly protected only if the State would wholly be stripped from every piece of testimonial evidence to make its case.  This, however, is not the governing legal principle.

The Supreme Court has observed that improper pretrial identification procedures by police may cause witnesses to misidentify a criminal.  See Simmons v. United States, 390 U.S. 377, 383 (1968).  An identification procedure may be deemed unduly and unnecessarily suggestive if it is based on police procedures that create "a very substantial likelihood of irreparable misidentification."  Id. at 384.  In such scenario, "the witness thereafter is apt to retain in his memory the image of the [misidentification] rather than that of the person actually seen, reducing the trustworthiness of subsequent lineup or courtroom identification."  Id. at 383-84.  "It is the likelihood of misidentification which violates a defendant's right to due process . . . . Suggestive confrontations are disapproved because they increase the likelihood of misidentification."  Neil v. Biggers, 409 U.S. 188, 198 (1972).

Even if an identification procedure is unnecessarily suggestive, admission of the suggestive identification does not violate due process so long as the identification possesses sufficient aspects of reliability, see Manson v. Brathwaite, 432 U.S. 98, 106 (1977), for reliability

16

is the "linchpin in determining the admissibility of identification testimony." Id. at 114; see also United States v. Wise, 515 F. 3d 207, 215 (3d Cir. 2008). Thus, the central question is "'whether under the totality of the circumstances the identification was reliable even though the confrontation procedure was suggestive.'" Brathwaite, 432 U.S. at 106 (quoting Biggers, 409 U.S. at 199); see also United States v. Maloney, 513 F. 3d 350, 355 (3d Cir. 2008). Factors to be considered include "the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation." Biggers, 409 U.S. at 199. Significantly, where "identifications were entirely based upon observations at the time of the [incident] and not at all induced by the conduct" of the pretrial identification procedures, the identification does not violate due process. See Coleman v. Alabama, 399 U.S. 1, 7 (1970).

Moreover, while the Supreme Court has recognized that "improper employment of photographs by police may sometimes cause witnesses to err in identifying criminals," Simmons, 390 U.S. at 383, and identified certain procedures that heighten the risk of misidentification (including such practices as displaying the photo of only a single individual who generally resembles the person the witness saw, showing the witness photos of several persons among which the photograph of a single individual recurs or is in some way emphasized, or indicating to the witness that police have other evidence that one of the persons pictured committed the crime, see id.), the Supreme Court – despite the risk of misidentification – has never prohibited the employment of photographic identification methods, either in the exercise of its supervisory power or as a matter of constitutional requirement. See id. The Court only required that each

17

case must be considered on its own facts and must be evaluated in light of the totality of

surrounding circumstances, stressing that the risk of conviction based on photo misidentification

"may be substantially lessened by a course of cross-examination at trial which exposes to the jury

the method's potential for error."  Id.

In light of the foregoing, Petitioner's position asserting that the State's witnesses' positive

identifications had to be suppressed simply because they were obtained after the State's

witnesses failed to make identifications or expressed doubts, or stated their reservations to make

an identification, or made dual/alternative identifications, is facially without merit.  Moreover,

short of noting that Bucci was shown, in actuality, Petitioner's mother's van (and, in response to

such showing, stated that he was 75% sure it was the shooter's van), Petitioner does not point out

to any action by the police that could be qualified, with any stretch of imagination, as

"suggestive":[8] all he does is rehash the initial uncertainties and misidentifications that the State's

witnesses expressed or made.  Because any such shortcomings in the witnesses' identifications

and testimonies were clearly conveyed to the jurors for the purposes of the jury's assessment of

---

[8] Even assuming, *arguendo* (and without making a finding as such), that the protective due process measures ensuring against misidentification of criminal *defendants* apply also to identifications of tangible items, such as a van, such would not salvage Petitioner's claims since the physical showing of Petitioner's mother's van to Bucci was neither a "suggestive" act by the police nor produced an identification with certainty.  Moreover, Petitioner's vaguely asserted contention that, at a later point, Bucci might have been shown a photo array consisting only of Polaroid photos of Petitioner's mother's van plays against Petitioner, since such showing, again, resulted – as Petitioner himself admits – in Bucci's statement that the so-photographed van was not the one which Bucci could identify as the shooter's.  Hence, such if such an array could be qualified as "suggestive," it did not yield a result that the State could rely upon; rather, it yielded a result that Petitioner could capitalize on. And, if the Court were to factor into the aforesaid analysis the fact that all Bucci's uncertainties were highlighted to Petitioner's jurors during detailed cross-examination, Petitioner's due process claim based on the witnesses' identifications of the van becomes patently meritless.

credibility/reliability of the witnesses' out-of-court and in-court identifications, the Court finds

that Petitioner's due process rights were not violated during his re-trial.

Consequently, the state courts' dismissal of this line of Petitioner's challenges was not an

unreasonable application of Supreme Court precedent, and Petitioner's assertion of such

unreasonableness is without merit and warrants no habeas relief.

**B.**    **Challenges Based on Public Trial Clause**

**1.**    **Pertinent Background**

The voir dire proceedings in Petitioner's trial took two days, January 30 and 31 of 2001.

See Docket Entries Nos. 10-10 and 10-11.  After a number of peremptory challenges,

disqualifications and excuses of venire persons with regard to the first panel of jurors, which was

voir dired on January 31, Petitioner's trial judge ("Judge Petrolle") had to order another panel of

jurors, so the selection process could continue to complete the then-uncompleted jury.  See

Docket Entry No. 10-11.  Noting that the courtroom facility was rather small, and the total

number of venire persons from the remainder of the first panel and the upcoming second panel

could become quite large, Judge Petrolle inquired with Petitioner's counsel about the spectators

in the courtroom.  See id.  In response, Petitioner's counsel advised Judge Petrolle that these

spectators were Petitioner's relatives.  See id.  Judge Petrolle replied by observing that the

courtroom was a public place and the trial was, indeed, public, but – since there was a large

number of jurors in the courtroom, Judge Petrolle would ask Petitioner's relatives to remain away

from the jurors.  See id.  In addition, Judge Petrolle noted that, if the second panel comes in and

takes the courtroom's entire capacity, then the spectators would have to be placed outside the

courtroom.  See id.  Judge Petrolle stressed that such measure, if used, would be employed only

to accommodate potential jurors, who were, by definition, critical to Petitioner's trial.  See id.
Judge Petrolle closed that observation by a clarification that, in the event the spectators/relatives
were asked to step out, they would be allowed back into the courtroom once space becomes
available.  See id.  Petitioner's counsel did not take issue with utilizing such measures. See id.

The record does not show that the overcrowding situation ever developed to such a
degree that Judge Petrolle actually asked any spectator to leave the courtroom.  See id.  To the
contrary, the record reflects that, when the jury was selected and sworn on January 31, Judge
Petrolle concluded that day's proceedings by making a directive to "everyone else" to remain in
the courtroom until the jurors were off the floor.  See id.  The language of this directive strongly
suggested that the spectators actually remained in the courtroom during the entire jury selection
process.

Petitioner, however, maintained on direct appeal that his relatives, including his mother,
were directed by Judge Petrolle to leave the courtroom on January 31, at the point when the
second jury panel was brought in.  See Docket Entry No. 11-1.  In accordance with that position,
Petitioner moved the Appellate Division for a remand to settle the record as to the factual issue
of whether spectators were actually excluded from the courtroom during a certain period of the
second voir dire day.  See id.  The Appellate Division granted Petitioner's request.  See Docket
Entry No. 11-2.

Upon that remand, Judge Petrolle held a hearing, at which Petitioner, his trial counsel and
the prosecutor participated trying to reconstruct, based on their memory, the events of the January
31 voir dire.  See Docket Entry No. 11-3.  Petitioner reasserted his position that his family
members were ordered to leave the courtroom when the second jury panel was brought in.  See

20

id.  Petitioner stated that he did not recall whether they were allowed back in and, if yes, when

exactly.  See id.  The prosecutor and Petitioner's counsel conceded that they both had no specific

recollection as to the issue of whether spectators were asked to leave the courtroom during this

second day of voir dire, although Petitioner's counsel had a recollection of going, at some point

during the trial, to see Petitioner's family members in the hallway.  See id.

Same as both counsel, Judge Petrolle had no specific recollections as to having spectators

excluded for any period of time.  See id.  He also noted that, as a general matter, he did not have

any policy regarding exclusion of spectators during criminal trials.  See id.  With that, Judge

Petrolle turned to the January 31, 2001, transcript of jury selection and to his "judge's list" of

jurors from that date.  See id.  His list indicated that 46 new venire persons were included in that

second panel.  See id.  Since this number was substantially less than the number of seats in the

courtroom, which benches could accommodate between 70 to 80 persons, Judge Petrolle

concluded that there had not been a time when there were not enough seats in the courtroom to

accommodate all the people who sought to be present, and – since he could not fancy a situation

when he would exclude spectators for a reason other than overcrowding or cause, such as an

inappropriate behavior, – he found that no exclusion of spectators actually took place at any point

in time.  See id.  In other words, Judge Petrolle found, as a fact, that he never acted upon his

concern to exclude the spectators in the event excessive overcrowding occurs.  See id.

During the course of his appeal, Petitioner never provided any statement from any of his

relatives, including his mother, which would verify his claim that spectators were excluded from

the courtroom by Judge Petrolle for any period of time.  See Docket Entries Nos. 11-4 and 11-5.

In the same vein, Petitioner did not present any such statement to this Court, see Docket Entry

No. 1, asserting that he had no power to subpoena his relatives' (or his mother's) statements.  See Docket Entry No. 12.

### 2.        Petitioner's Ground Two Is Without Merit

As noted supra, the court sitting in habeas review must give deference to determinations of state courts.  See Duncan, 256 F.3d at 196; Dickerson, 90 F.3d at 90.  Thus, federal courts "must presume that the factual findings of both state trial and appellate courts are correct, a presumption that can only be overcome on the basis of clear and convincing evidence to the contrary."  Stevens, 295 F.3d at 368.

Here, Petitioner presents, as the sole piece of evidence, his self-serving recollection.  That recollection cannot operate as a clear and convincing evidence offsetting Judge Petrolle's factual finding that no exclusion of spectators took place during any period of time on January 31, 2001.  Therefore, on this basis alone, Petitioner's challenges fail.  Moreover, based on the reasons that follow, even assuming, *arguendo*, that a brief exclusion, caused by excessive overcrowding, actually took place, such occurrence still would not salvage Petitioner's claims.

As a preliminary matter, the Supreme Court has held that the First Amendment guarantees of a public right encompass voir dire proceedings.  See Press-Enterprise Co. v. Superior Court of California, 464 U.S. 501, 505 (1984) (right to public jury selection); Gibbons v. Savage, 555 F.3d 112, 115 (2d Cir. 2009) ("The defendant has a right to an open, public trial, including during the jury selection"), cert. denied, 130 S. Ct. 61 (2009).  In addition, the Sixth Amendment guarantees a defendant the "right to a speedy and public trial, by an impartial jury." U.S. Const. amend. VI.  "The requirement of a public trial is for the benefit of the accused; that the public may see he is fairly dealt with and not unjustly condemned, and that the presence of

interested spectators may keep his triers keenly alive to a sense of their responsibility and to the importance of their functions . . . ."  Waller v. Georgia, 467 U.S. 39, 46 (1984) (quoting Gannett Co., Inc. v. DePasquale, 443 U.S. 368, 380 (1979)).  A "party seeking to close a hearing must advance an overriding interest that is likely to be prejudiced, the closure must be no broader than necessary to protect that interest, the trial court must consider reasonable alternatives to closing the proceeding, and it must make findings adequate to support the closure."  See Waller, 467 U.S. at 48.  If a violation occurs, although a defendant is not required to establish "specific prejudice in order to obtain relief," a new trial is not always required.  See id. at 49.  Moreover, while the right to a public trial is an important structural right, it is also one that can be waived when a defendant fails to object or outright concedes to the closure of the courtroom, that is, if the justification for closure is sufficient.  See Freytag v. Commissioner, 501 U.S. 868, 896 (1991) ("[T]he Sixth Amendment right to a trial that is 'public,' provide[s] benefits to the entire society more important than many structural guarantees; but if the litigant does not assert [it] in a timely fashion, he is foreclosed").

These considerations were highlighted in the Supreme Court's recent decision in Presley v. Georgia, 130 S. Ct. 721 (2010).  In Presley, the Supreme Court reversed a criminal judgment where the trial court excluded the sole spectator, the defendant's uncle, from the courtroom during voir dire upon the trial judge's concern that jurors might overhear inherently prejudicial remarks from the uncle.  Presley's counsel *expressly objected* to such exclusion.  Moreover, when Presley's counsel asked for some accommodations of the defendant's uncle, *the court refused* stating the uncle could come back in only when the trial would start.

23

Noting evidence showing that the prospective jurors could have been accommodated in the courtroom while still leaving adequate room for the uncle, the Supreme Court found the trial court's determination a violation of Presley's Sixth Amendment rights, explaining that "[t]here are no doubt circumstances where a judge could conclude that threats of improper communications with jurors or safety concerns are concrete enough to warrant closing voir dire. But in those cases, the particular interest, and threat to that interest, must be articulated along with findings specific enough that a reviewing court can determine whether the closure order was properly entered." Id. at 725 (internal quotation marks and citations omitted).

Here, the record unambiguously indicates Judge Petrolle's conclusion that exclusion of spectators would be warranted if, and only if, the overcrowding would become so excessive as to prevent accommodation of the venire persons in the courtroom, and – until such situation actually occurs – every measure would be taken to preserve Petitioner's right to public trial. Petitioner's counsel, being availed to Judge Petrolle's clear explanations of the reasons for potential exclusion – expressly *waived* any objections to such measure. Hence, even if this Court were to hypothesize that the overcrowding became such that a brief exclusion became necessary, both Judge Petrolle's clear articulation of the specific trigger for such exclusion, coupled with Petitioner's counsel's express waiver of objection, indicates that Petitioner's Sixth Amendment rights were not violated.[9]

---

[9] Notably, the decision in Presley put a much higher bench-mark than that existing during the pre-Presley period. See Presley, 130 S. Ct. at 725-27 (Thomas, Scalia, JJ., dissenting) (discussing the distinctions between First Amendment and Sixth Amendment protections and suggesting that a lower bar was set under the Sixth Amendment law, allowing a broader judicial discretion as to spectator exclusion). Therefore, the high requirements of Presley do not expressly apply to the Court's review of Petitioner's state courts' determinations rendered long

(continued...)

Therefore, Petitioner's position that the state courts' dismissal of this line of Petitioner's challenges was an unreasonable application of Supreme Court precedent is without merit. Consequently, it warrants no habeas relief.

### C.    Challenges Based on Prosecutorial Conduct and Statements

Here, Petitioner's Ground Three challenges are two-fold.  On the one hand, Petitioner maintains that the prosecutor knew that Bucci and Munoz's testimonies were false, but did allow that falsity go uncorrected.  On the another hand,  Petitioner tries to supplement his challenges to that effect by asserting that the prosecutor violated his due process rights when: (a) in her opening statement, she gave a characterizing preview of Munoz' testimony; and (b) in her closing statement, she gave a characterization of Bucci's testimony.  Both aspects of Petitioner's Ground Three are without merit.

In Napue v. Illinois, 360 U.S. 264, 269 (1969), and Giglio v. United States, 405 U.S. 150, 153-55 (1972), the Supreme Court held that a defendant's right to due process is implicated when the state obtains a conviction based upon testimony the state knows is perjured.  In both Napue and Giglio, the state's eyewitnesses, on whose testimonies those cases literally turned, were either facing the prospect of prosecution or had already been convicted.   Although both these witnesses were promised consideration from the state in return for their testimony at trial, they both falsely testified that they had not been promised anything for their testimony.  Later on, it was factually shown that the state prosecutors in both cases knew – at the time when these testimonies were

---

⁹(...continued)
before the Supreme Court ruled in Presley.  See Williams, 529 U.S. at 412 (habeas review is conducted in light of Supreme Court precedent existing "as of the time of the relevant state-court decision").  However, here, the decisions of state courts do meet even the high bar posed by Presley years after these state court decisions were issued.

given – that these testimonies were unambiguously false, but did nothing to correct the falsity. The Supreme Court found such prosecutorial conduct a violation of due process: when the "reliability of a given witness [is] determinative of guilt or innocence," prosecutorial use of or acquiescence to false testimony violates constitutional safeguards.  See Giglio, 405 U.S. at 154; Napue, 360 U.S. at 269.  Here, the safeguards of Giglio and Napue are not implicated.

Petitioner raised his challenges to the prosecutor's introduction of Bucci and Munoz's testimonies during his PCR proceedings.  Judge Petrolle found, as a fact, that no false testimony was presented.  Specifically, addressing Petitioner's distinction between Bucci's statement (that Bucci was only 75% sure that the van he was physically shown by the police was the vehicle used by the shooter) and Detective De Maio's statement (that Bucci could not make a positive identification of Petitioner's mother's van when Bucci was shown the van), Judge Petrolle concluded that these statements were easily harmonizable, since – in terms of police investigation – Bucci's 75% certainty was not a sufficient enough positive identification. Petitioner does not offer the Court any clear and convincing evidence that Judge Petrolle erred in his finding of Bucci's lack of falsity and in his derivative factual finding of lack of prosecutorial knowledge of falsity.  In fact, Petitioner offers this Court no evidence whatsoever: all he offers is his self-serving characterization of Bucci and De Maio's testimonies and his self-serving deducement that the distinction should be interpreted as both Bucci's falsity and the prosecutor's knowledge of such falsity.  Such allegations, however, cannot support a viable fact-based claim.

The same shortcomings plague Petitioner's challenges based on Munoz's testimony.  In connection with Munoz's account of events and post-murder rounds of identification, the jurors were informed of Munoz's initial selection of two photos, and Munoz's explanation that he did

not disclose his positive choice of Petitioner's photo as that of the assailant because Munoz – on the day of the murder – was a shocked 11-year-old who wanted to cut his interactions with the police short.  During Petitioner's trial, Munoz utilized such words "upset and nervous" to define the emotions he was experiencing on that day.  In her opening statement, the prosecutor – giving the jurors a roadmap of the upcoming testimonies, including Munoz's upcoming testimony – defined Munoz's emotions on the day of the murder as those of being "scared/afraid."  Petitioner asserted during his PCR, and maintains now, his puzzling deducement that this semantical difference must mean that the prosecutor knew of Munoz's testimony to be false and, moreover, prompted/coached Munoz to testify falsely.  This Court agrees with Judge Petrolle's conclusion that this difference in semantics and Petitioner's vivid imagination cannot be read as indicative of any falsehood on the part of Munoz (and, certainly, as the prosecutor's knowledge of Munoz's falsity, moreover her "coaching" of Munoz).  In other words, Petitioner's self-serving far-fetched conjecture cannot operate as clear and convincing evidence offsetting Judge Petrolle's factual findings.

Finally, returning to Bucci's testimony, Petitioner asserts that the prosecutor violated his due process rights when, addressing the jurors in her summation, she revisited Bucci's "75%-sure" statement.  Specifically, in response to Petitioner's counsel's attacks on the credibility/ reliability of Bucci's testimony, the prosecutor commented that Bucci's clarification (i.e., Bucci's statement that he was only "75% sure") was entered because, as a "conscientious" person, Bucci did not want to misrepresent the fact that he was unable to make a 100% positive identification.  Petitioner claims that the prosecutor's reference to Bucci as a "conscientious" person was an undue vouching that violated Petitioner's due process rights.

27

Where a prosecutor's opening or closing remarks are challenged in habeas, "[t]he relevant question is whether the prosecutor's comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" Darden v. Wainwright, 477 U.S. 168, 181 (1986) (quoting Donnelly v. DeChristoforo, 416 U.S. 637 (1974)).  In evaluating the likely effect of improper comments, a court may consider whether the improper comments were invited by the particular circumstances of the trial.  Cf. Darden, 477 U.S. at 181-82.  Thus, "Supreme Court precedent counsels that the reviewing court must examine the prosecutor's [challenged comment] in context and in light of the entire trial, assessing the severity of the conduct [and] the effect of the curative instructions." Moore v. Morton, 255 F.3d 95, 107 (3d Cir. 2001).  "Moreover, the concept of 'fair response' allows a party to respond to statements made by opposing counsel." Forbes v. Ricci, 2011 U.S. Dist. LEXIS 480, at *53 (D.N.J. Jan. 3, 2011) (citing United States v. Robinson, 485 U.S. 25, 32 (1988)).

Here, the prosecutor defined Bucci as  a conscientious person in response, and as a counter-explanation, to Petitioner's counsel's cross-examination of Bucci and summation, which pointed out the uncertainties Bucci experienced and construed Bucci's need to clarify that he was only 75% sure in his identification as a statement indicative of lack of reliability of Bucci's later-made out-of-court and in-court identifications.  In light of Petitioner's counsel's position, the prosecutorial comment challenged by Petitioner appears to be a properly crafted fair response.  In any event, this one-word comment did not so infect Petitioner's trial with unfairness as to make Petitioner's conviction a denial of due process.  Moreover, Petitioner's hinted-at position that the jurors might have unduly heeded to the prosecutor's opening and closing comments by mistaking

them for evidence is without merit: neither opening nor closing statements are considered evidence, and Petitioner's jury was duly advised of the same.

Finally, the Court agrees with Judge Petrolle's conclusion that Petitioner's conviction did not turn on such niceties as Bucci's identification of Petitioner's mother's van; rather, it turned on Bucci's right-on-point immediately-post-murder descriptions (of the van, including the color and type, the missing hubcap, the old New Jersey licence plate, the suiting plate lettering, etc.), the statements about the murder obtained from all witnesses, Petitioner's motif for this otherwise-senseless murder, the temporal proximity between the murder and Jorge's break-off with Petitioner, the weakness of his "I was driving the van" alibi, his false denial of any frictions with Cortez, and so on.

In light of the foregoing, Petitioner's challenges, grouped into his Ground Three, are without merit, and the state courts' dismissal of these challenges was not an unreasonable application of Supreme Court precedent. Therefore, Petitioner's Ground Three will be dismissed as not warranting habeas relief.

### D.   Challenges Based on the Counsel Clause

Petitioner's Ground Four asserts a violation of Petitioner's Sixth Amendment right to counsel.

The Sixth Amendment, applicable to states through the Due Process Clause of the Fourteenth Amendment, guarantees the accused the "right . . . to have the Assistance of Counsel for his defense." U.S. Const. amend. VI. The right to counsel is the right to the effective assistance of counsel, and counsel can deprive a defendant of the right by failing to render adequate legal assistance. See Strickland v. Washington, 466 U.S. 668, 686 (1984).

A claim that counsel's assistance was so defective as to require reversal of a conviction has two components, both of which must be satisfied.  See Strickland, 466 U.S. at 687.  First, the defendant must "show that counsel's representation fell below an objective standard of reasonableness."  Id. at 687-88.  The court must then determine whether, in light of all the circumstances at the time, the identified errors were so egregious that they were outside the wide range of professionally competent assistance.  See id.

To satisfy the prejudice prong, the defendant must show that "there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt."  Id. at 695.   As the Supreme Court explained,

> [i]n making this determination, a court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury.  Some of the factual findings will have been unaffected by the errors, and factual findings that were affected will have been affected in different ways.  Some errors will have had a pervasive effect on the inferences to be drawn from the evidence, altering the entire evidentiary picture, and some will have had an isolated, trivial effect.  Moreover, a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support. Taking the unaffected findings as a given, and taking due account of the effect of the errors on the remaining findings, a court making the prejudice inquiry must ask if the defendant has met the burden of showing that the decision reached  would reasonably likely have been different absent the errors.

Strickland, 466 U.S. at 695-96.[10]

---

[10]  The Supreme Court instructs that a court need not address both components of an ineffective assistance claim "if the defendant makes an insufficient showing on one."  Strickland, 466 U.S. at 697.  "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed."  Id.

Here, Petitioner asserts that his counsel was ineffective for deciding not to call, during Petitioner's second trial, Detective De Maio in order to "impeach" Bucci.  In line with his above-discussed Ground Three challenges, Petitioner maintains that De Maio's conclusion (that Bucci failed to make a positive identification when Bucci was shown Petitioner's mother's van) must be read as directly contradicting Bucci's admission that he identified the van as being only "75%-sure" that it was the shooter's vehicle.  However, as explained supra, De Maio and Bucci's statements are reconcilable.  Therefore, Petitioner's counsel could easily conclude that a thorough cross-examination of Bucci, exploring his uncertainty and failure to identify the van, was a strategy more effective than De Maio's testimony.  Consequently, Petitioner's challenges fail to meet even the first prong of the Strickland test and shall be dismissed accordingly.[11]

Moreover, Petitioner also fails to meet the second prong of Strickland.  In light of the extensive cross-examination of Bucci, which highlighted to the jurors Bucci's uncertainty and failure to identify, Petitioner's position that De Maio's testimony would have tipped the scale is without merit.  The content of De Maio's potential testimony cannot be read as suggesting a reasonable probability that – had the jurors heard De Maio's statement and factored it into the totality of evidence presented during Petitioner's second trial – the jury would have had a reasonable doubt with respect to Petitioner's guilt.

Consequently, Petitioner's challenges based on the Counsel Clause are without merit, and the state courts' decisions dismissing these challenges were not an unreasonable application of Supreme Court precedent.  Petitioner's Ground Four will, thus, be dismissed.

_____

[11]  Petitioner's claim that De Maio could have been implemental in showing that Bucci failed to identify Petitioner is divorced from the facts of Petitioner's trial, since Bucci – who saw only the shooter's back – was never called to identify Petitioner, in court or out of court.

### E.      Challenges Based on Jury Instructions

Finally, Petitioner's Ground Five alleges that the jury instructions provided by his trial judge violated Petitioner's due process rights because the judge instructed the jurors on the issue of witness identification but did not expressly hammer in the weaknesses of the State's position. Stripped of all niceties, Petitioner's Ground Five effectively asserts that the instructions were erroneous because the judge did not prejudicially skew them in Petitioner's favor (by seeding an undue emphasis adorned by the imprimatur of judicial opinion), but rather allowed the jurors to make up their own minds.

Where a federal habeas petitioner challenges jury instructions given in a state criminal proceeding,

> the only question for [federal courts sitting in habeas review] is "whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process."  It is well established that the instruction "may not be judged in artificial isolation," but must be considered in the context of the instructions as a whole and the trial record.  In addition, in reviewing an ambiguous instruction . . . , [federal courts] inquire "whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way" that violates the Constitution.  And we also bear in mind our previous admonition that [federal courts] "have defined the category of infractions that violate 'fundamental fairness' very narrowly."  "Beyond the specific guarantees enumerated in the Bill of Rights, the Due Process Clause has limited operation."

Estelle v. McGuire, 502 U.S. 62, 72-73 (1991) (citations omitted).

Therefore, the Due Process Clause is violated only where "the erroneous instructions have operated to lift the burden of proof on an essential element of an offense as defined by state law." Smith v. Horn, 120 F.3d 400, 416 (3d Cir. 1997); see also In re Winship, 397 U.S. 358, 364 (1970) ("the Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is

charged"); <u>Sandstrom v. Montana</u>, 442 U.S. 510, 523 (1979) (jury instructions that suggest a jury may convict without proving each element of a crime beyond a reasonable doubt violate the constitutional rights of the accused).

Here, there is no dispute that the instructions given by Petitioner's trial judge were almost a carbon copy of the model jury charge and, as such, they adequately highlighted all the determinations that the jurors were called to make as to the validity, credibility and reliability of witnesses' identifications.  Moreover, the instructions given in Petitioner's case even included a reminder of the fact that some of the State's witnesses actually made in-court and out-of-court identifications, hence stressing to the jurors the relevance of witness-identification considerations.  Assessed in its entirety, this language safeguarded, with abundance, Petitioner's due process rights.

Therefore, Petitioner's position that the state courts' decisions dismissing his challenges to the jury instructions were an unreasonable application of Supreme Court precedent is without merit, and Petitioner's Ground Five will be dismissed as not warranting habeas relief.

### F.     Certificate of Appealability

The Court must now determine whether a certificate of appealability should issue.  <u>See</u> Third Circuit Local Appellate Rule 22.2.  The Court may issue a certificate of appealability only if the petitioner "has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  "[A] petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims."  <u>Miller-El v. Cockrell</u>, 537 U.S. 322, 327 (2003).

Here, the Court is persuaded that jurists of reason would not disagree with this conclusion.  Therefore, no certificate of appealability will issue.

## V.    CONCLUSION

For the foregoing reasons, this Court dismisses the Petition and denies Petitioner a writ of habeas corpus, pursuant to  28 U.S.C. § 2254.

No certificate of appealability will issue, pursuant to 28 U.S.C. § 2253(c)(2).

An appropriate Order accompanies this Opinion.


 /s/ Jose L. Linares
**JOSE L. LINARES**
United States District Judge


Dated: April 13, 2011